UNITED STATES of America

v.

INTERNATIONAL PAPER
COMPANY et al.

UNITED STATES of America

v.

BOISE CASCADE CORPORATION et al.

Crim. Nos. 78–H–11, 78–H–12.

United States District Court,
S. D. Texas,
Houston Division.

July 14, 1978.

J. Albert Kroemer, U. S. Dept. of Justice, Dallas, Tex., for plaintiff.

Richard N. Carrell, Fulbright & Jaworski, Robert Malinak, Baker & Botts, Joseph Jaworski, Bracewell & Patterson, William Junell, Jr., Reynolds, Allen & Cook, Gerald Applewhite, Applewhite & Maguire.

## MEMORANDUM OPINION

SINGLETON, District Judge.

On July 7, 1978, a pretrial hearing was held before this court on the motion of defendants in these two cases to dismiss both indictments for grand jury abuse. At the court's suggestion and with the defendants' concurrence, defendants have submitted a joint motion to dismiss, joint briefs and the joint affidavits they selected as showing the patterns of abuse of which they complain. After careful consideration of the arguments of counsel, as well as the briefs, motions, and affidavits filed with the court on this issue, the court finds that the motion to dismiss should be overruled.

An investigation into alleged price fixing activities in the corrugated container industry was begun in late 1975. In July, 1976, a grand jury in Houston began hearing testimony on this matter, and in January, 1978, it returned two indictments, one for price-fixing activities prior to the beginning of 1975 and the other for similar activities continuing after that time.[1] It is the defendants' contention that various practices of the attorneys and staff of the Department of Justice during the grand jury investigation constitute abuse of the process

---

1. As of January 1, 1975, violations of the price-fixing statute, 15 U.S.C. § 1 changed from misdemeanor to felony offenses. *U. S. v. International Paper, et al.,* Crim.No. 78–H–11 is the felony indictment and *U. S. v. Boise Cascade Corp. et al.,* Crim.No. 78–H–12 is the misdemeanor indictment.

and require dismissal of both indictments. Specifically, they attack the interview procedure, the use of summaries, the proffer system, and certain statements of the prosecuting attorney concerning Fifth Amendment rights. Throughout their briefs and arguments the defendants raise the question of what evidence the prosecutor must place before the grand jury and the manner in which he must present it.

Before the hearing on July 7, the government and defendants submitted those affidavits they considered important to the issues raised by the motion to dismiss. The facts about the investigation given in this opinion are taken from these affidavits. Over the course of the grand jury investigation some 190 witnesses were examined. Approximately 90 appeared before the grand jury and the others were interviewed solely by Department of Justice employees —attorneys, a paralegal named Russell Abrego, and one or more F.B.I. agents. This interview testimony was then summarized to the grand jury by the sworn testimony of the paralegal, Mr. Abrego. Of the 190 witnesses, some were subpoenaed and some agreed to interviews without subpoenas. Some agreed to interviews but requested that a subpoena be issued for form's sake. Most of the witnesses who were subpoenaed, and apparently all who appeared without subpoena, were given the option of testifying before the grand jury or in an interview. No witness was subpoenaed to appear at an interview, but many were given the choice of doing so rather than appearing before the grand jury. A significant number refused to be interviewed. Several witnesses appeared before the grand jury and later appeared in an interview session. The interviews were conducted at the Dallas, Texas, office of the Antitrust Division or in Chicago or New York, allegedly for the convenience of the witnesses and their attorneys. Witnesses were allowed to bring their attorneys to the interviews, an option unavailable before the grand jury.

Those witnesses who appeared before the grand jury frequently invoked their Fifth Amendment privilege against self-incrimination, so that the government was forced to request court orders granting immunity if it wished to hear their testimony. Interview witnesses also demanded immunity before testifying, and this was accomplished through a letter from the Antitrust Division promising to treat information given by the witness as if pursuant to a court order granting immunity. The decision whether to seek court-ordered immunity for witnesses before the grand jury or to issue an informal "immunity letter" was based on proffers of testimony, typically made orally by the prospective witness's attorney, outlining the material to which the prospective witness planned to testify. If the testimony appeared valuable enough in terms of the ultimate outcome of the investigation, the appropriate form of immunity would be sought. As the investigation progressed, the government attorneys became more selective in their immunity grants, requiring information that would carry the investigation into new fields. They issued to those attorneys who requested them certain guidelines for determining whether immunity would be sought: (1) testimony which would implicate someone higher than the witness in his own or another company, (2) testimony which would show violations in the "felony period", i. e., after January 1, 1975, or (3) testimony which would expand the geographic scope of the alleged conspiracy.

The government attorneys assured interview witnesses that their testimony would be kept as secret as testimony before the grand jury. In fact, either the transcript or the tape of each interview was furnished to the grand jury, though not read or played to them in its entirety. The government contends that this brought the interviews under the veil of grand jury secrecy.

Grand jury witnesses were, of course, placed under oath. Interview witnesses were also sworn when a court reporter was present to transcribe their testimony. In the majority of cases the interview was tape recorded and the transcript sent to the witness for attestation. Interview witnesses not sworn by a court reporter were ad-

vised that making false or misleading statements could subject them to criminal penalties. The government explains this admonition and attestation as a means to make the statements admissible in subsequent judicial proceedings under 28 U.S.C. § 1746 and to subject the witness to criminal sanctions for lying under 18 U.S.C. § 1001. The statute which makes punishable perjury before a grand jury is 18 U.S.C. § 1621, which would not apply to non-grand jury testimony.

The defendants' first contention is that these interviews, although uniformly conducted out of the presence of any grand juror, constitute proceedings before the grand jury. If this is so, the presence of persons not authorized under Rule 6(d), Fed.R.Crim.P., is a *per se* abuse requiring dismissal of the indictments. *U. S. v. Echols*, 542 F.2d 948 (5th Cir.), *cert. denied*, 431 U.S. 904, 97 S.Ct. 1695, 52 L.Ed.2d 387 (1977). It is uncontroverted that Mr. Abrego, various F.B.I. agents, and the witnesses' attorneys were unauthorized persons and that they were present at the interviews. The only question is whether these interviews can be considered grand jury proceedings.

Defendants cite one case for this proposition, *United States v. Phillips Petroleum Company*, 435 F.Supp. 610 (N.D.Okl.1977). In *Phillips* a witness was subpoenaed and immunized by court order, testified before the grand jury and, at the close of the day, continued his testimony in a recorded interview at the prosecutor's office in the presence of his attorney and an I.R.S. agent. The witness's testimony was central to the case, and in the post-appearance interview he gave testimony which could be considered broadly exculpatory. This latter testimony was never presented to the grand jury. Judge Barrow held that the interview was part of the grand jury proceedings and the exculpatory testimony should have been placed before the grand jury. Both these irregularities were held to be abuses of the grand jury process, necessitating dismissal of the indictments. 435 F.Supp. at 618.

The defendants have cited no other case, and this court's independent research has discovered none, holding an interview at which no grand juror was present to be a grand jury proceeding. There are significant differences between *Phillips* and the cases before the court. In *Phillips* the prosecutor stated, ". . . for the record, this is a continuation of Mr. Akright's grand jury testimony . . . .. This will be considered part of the grand jury records and will be under the same conditions of use immunity we have previously extended through order of the Court." 435 F.Supp. at 616. In contrast, in these cases the prosecutors made clear that the interviews were given *in lieu of* a grand jury appearance. See Exhibit A, attached hereto and incorporated herein, a copy of the form letter sent to interviewees by the government. Second, in *Phillips* the interview testimony was not made available to the grand jurors, whereas here it was supplied to them. Third, the witness's testimony in *Phillips* was unique, crucial, and exculpatory. Here the grand jury heard live testimony implicating each of the defendants. Defendants have given this court no reason to believe that any of the interviewees occupy such a pivotal position, or that their testimony was exculpatory. It appears that *Phillips* was essentially a one-witness case and that the witness told an incriminating story before the grand jury and an exculpatory one in the interview. We have no hint of a similar problem here.

Even if these three important factors were not so different, this court is not persuaded that *Phillips* should be followed. The reasons for excluding unauthorized persons from the grand jury—protection of witnesses and grand jurors from intimidation, coercion, or retribution; preventing the flight of the guilty; and preserving the reputation of the innocent—do not apply to interviews such as these. No grand juror was present to be intimidated or coerced; the witnesses enjoyed as much secrecy as they would had they been before the grand jury; and the unauthorized persons present were those to whom the proceedings could

and would naturally be disclosed, the witnesses' attorneys and the government investigators.[2] The defendants contend that the "trappings" of the grand jury—subpoenas, immunity, secrecy, and sworn testimony—render the interviews the equivalent of actual grand jury proceedings. The court finds this reasoning unpersuasive. No witness was compelled to testify at an interview by subpoena, though apparently many were given a choice. Witnesses could schedule interviews at more convenient times and places and could have their attorneys present to advise them.

The other similarities between the interviews and grand jury proceedings seem adequately explained as well. Informal letter grants of immunity were necessary to get information in the interviews. They were not pursuant to court order. Since the transcripts or tapes were presented to the grand jury, they fell at least within the penumbra of the secrecy covering its proceedings. The requirement that interview witnesses swear to the truth of their statements is a common one in all investigative work. The court finds that neither singly nor together do these similarities render the interviews proceedings before the grand jury, and the presence of investigators and witnesses' attorneys do not constitute grounds for dismissal of the indictment.

▇▇▇ The defendant's next contention is that the use of summaries was abusive. They argue that summarization by a partisan deprives the grand jury of exculpatory evidence which might prevent an indictment. The Fifth Circuit has recently rejected a similar argument in *United States v. Brown*, 574 F.2d 1274 (1978). In *Brown* the grand jury heard only summarized testimony from a government agent. In sustaining the indictment on this point, the court said:

"By its very nature, the grand jury process is not an adversary proceeding. Its function is merely to determine if there is probable cause which warrants the defendant's being bound over for trial. A defendant has no right to require that the Government present all available evidence at this proceeding. The grand jury proceeding is a one-sided affair. The defendant is protected from such one-sidedness when, at the trail on the merits, he is "accorded the full protections of the Fifth and Fourteenth Amendments" and is "permitted to expose all of the facts bearing upon his guilt or innocence". *United States v. Chanen*, 549 F.2d 1306, 1311 (9 Cir. 1977).

Defendants attempt to distinguish *Brown* and the long line of cases upholding indictments based on summarized testimony of investigative agents[3] by saying they dealt only with the evidentiary aspect of hearsay testimony, whereas here defendants attack the fundamental unfairness of partisan summarization. They maintain that selective presentation arrogates to the prosecutor the role and powers of the grand jurors, and that the court in its supervisory capacity over the grand jury should prevent such usurpation. This reading of *Brown* is too narrow. *Brown* makes it clear that the government may be selective in the evidence it presents to the grand jury, and that there is no obligation to present everything that could be considered exculpatory. Further, the court in *Brown* cites extensively from *United States v. Chanen*, 549 F.2d 1306 (9th Cir. 1977) in which the Ninth Circuit Court of Appeals gave careful consideration to the extent of the judiciary's powers to dictate to the prosecuting attorney, an arm of the executive branch of our government, in the performance of his duty. Though the courts have unquestiona-

2. Rule 6(e), Fed.R.Crim.P. was amended effective October 1, 1977, specifically to permit disclosure of proceedings to necessary government personnel. The Notes of the Advisory Committee on the 1977 Amendment make clear that it was approving the trend in case law to allow such disclosure where necessary for the purposes of the grand jury investigation.

3. E. g., *Costello v. United States*, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956); *United States v. Cruz*, 478 F.2d 408 (5th Cir.), cert. denied, 414 U.S. 910, 94 S.Ct. 259, 38 L.Ed.2d 148 (1973).

ble authority to oversee clear abuse of prosecutorial discretion,[4] defendants have not shown such abuse. Within the bounds of non-abusive conduct, we think the Department of Justice is free to conduct its presentation to the grand jury without interference by the courts. It should be emphasized that the Houston grand jury heard live witnesses who, according to the prosecutor's affidavit, implicated every defendant; that the summaries were given under oath; and that the summarized material, as well as the summaries, was made available to the grand jury. This was a massive and complex investigation, taking in most of the continental United States, an eighteen year period, and many alleged conspirators. The prosecuting attorney serves as the guiding arm of the grand jury and is responsible for an orderly and intelligible presentation of its case. We find no abuse of this authority in the use of summaries made in these cases.

■ The defendants next complain of the proffer system utilized by the prosecutors on the ground that it was coercive and likely to lead to deliberate or unconscious misstatements. The government could not, of course, require any witness to make a proffer of testimony and many individuals declined to do so. In the fall of 1977, in the closing days of the grand jury, the government responded to requests of various attorneys to name "targets", companies or individuals the government considered subject to indictment. The government continued to offer immunity for testimony which would advance the investigation along the guidelines previously described. Defendants argue that the fear of indictment may have led some witnesses to color or change their testimony to obtain immunity. There

is no evidence that any witness did indeed color his testimony.[5] Although the government concedes, as indeed it must, that there is some inherent possibility of a witness's coloring his story to get immunity, it contends that the likelihood is slight, that it has not been shown to have occurred here, and that the remedy, if any remedy is needed, is in the right of defense attorneys to cross-examine immunized witnesses about their bargains at trial. The practice is analagous to plea bargaining, which creates the possibility that an innocent person may plead guilty out of fear of conviction and a harsher sentence. The exchange of information for immunity, like plea bargaining, is deeply embedded in our criminal justice system. Defendants' attorneys will have full opportunity to inquire into every aspect of the grants of immunity and use any questionable matter for impeachment purposes.

Next defendants complain that counsel for the government denigrated and attempted to intimidate those who asserted their Fifth Amendment privilege against self-incrimination. The court has carefully perused the grand jury transcripts of the witnesses Messrs. Teinert, Allin, and Dalehite relative to this question and the affidavits submitted by counsel, and finds no abuse and no likelihood of injury to the defendants on this point.

Finally, defendants urge that the cumulative effect of all these practices itself was a grand jury abuse. It is this court's firm opinion that neither singly nor in conjunction do the events and procedures outlined herein constitute abuse of the grand jury process such as to justify dismissal of these indictments.

---

**4.** See, e. g., United States v. DeMarco, 550 F.2d 1224 (9th Cir. 1977); United States v. Treadway, 445 F.Supp. 959 (N.D.Tex.1978).

**5.** Defendants have drawn the court's attention to one witness, Mr. Charles Blanchard, whose original proffer included testimony as to pricing conversations occurring in "late 1974 or early 1975". One of the government attorneys telephoned Mr. Blanchard's lawyer and explained that immunity would be recommended only if Mr. Blanchard testified that the conver-

sations occurred in 1975. Mr. Blanchard then decided they must have been in 1975, because ". . . bidding on the accounts relating to the aforementioned pricing conversations generally took place in February of each year and it would have been unlikely for a pricing conversation to take place at a period of time substantially prior to the time the bidding actually took place." There is no suggestion that Mr. Blanchard's memory or reasoning is erroneous.

■ Defendants have also moved for extensive discovery relative to the issue of grand jury abuse. We are mindful of the warning given by the Supreme Court in *Costello v. United States*, 350 U.S. 359, 363, 76 S.Ct. 406, 100 L.Ed. 397 that an indictment, valid on its face and returned by a legally constituted grand jury, is enough to call for a trial on the merits and that if it were otherwise a defendant could always insist on a kind of preliminary trial to determine the competency and adequacy of the evidence before the grand jury. The time-honored rule protecting the secrecy of grand jury proceedings expressed in Rule 6(e), Fed.R.Crim.P., allows disclosure only where defendant has shown that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury. The court finds the affidavits already filed sufficient to enable it to decide this question and therefore overrules this motion.

This court has serious concern that the independence of the grand jury can be and no doubt in many instances has been seriously undermined by tactics of certain prosecutors and in ways which would not necessarily reach the level of prosecutorial misconduct sufficient to bring about a dismissal of an indictment. The court suggests that there are certain reforms that could and probably should be made by the Congress so that the grand jury can really be a primary security to the innocent against hasty, malicious, and oppressive persecution and to stand between the accuser and the accused to determine that a charge is founded upon reason and is not dictated by an intimidating power or by malice and personal ill will. *Wood v. Georgia*, 370 U.S. 375, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962).

Such reforms would include the following:

(1) Except for deliberations relating to voting and to voting itself, a statutory requirement that all grand jury proceedings be transcribed, with penalties prescribed for asking that any testimony, comments, or discussions be off the record.

(2) Each witness that appears before the grand jury would be given the right to have an attorney accompany him, not to cross-examine the witness or the grand jury or to make any comments whatsoever but solely to advise. In instances where the government believes that the presence of an attorney would be detrimental to the grand jury process, a motion could be made before the United States District Court for a determination as to whether or not the attorney should be present.

(3) Each witness that appears before the grand jury should be given a free transcript of his testimony before the grand jury.

(4) If the government presents any matter to the grand jury and that grand jury does not return an indictment relating to those matters, those matters should not again be allowed to be presented to another grand jury.

EXHIBIT A

*UNITED STATES DEPARTMENT OF JUSTICE*

ANTITRUST DIVISION

DALLAS OFFICE
1100 COMMERCE STREET ROOM 8C6
DALLAS, TEXAS 75242

Dear Mr. _____:

Recent conversations between your attorney, Mr. _____, and representatives of this Office have resulted in an agreement that you will provide this Office information in connection with an investigation into the corrugated container industry in lieu of an appearance before the grand jury conducting this investigation. It is understood that you will submit to an interview by members of this Office, during which you will be questioned as if before the grand jury, with the further understanding that the information you reveal will be reduced to a verbatim transcript which you will review, attest to the accuracy and completeness of the statements made therein, and return to us.

Specifically, you will be questioned thoroughly and extensively about your knowledge of the corrugated container industry and the pricing of corrugated boxes. It is a material condition of this agreement that you give full, accurate and complete answers to the questions asked of you, and you should understand that any withholding of information, or the giving of any false or misleading statement may subject you to criminal penalties.

For our part, you have our assurance that the information which you reveal in the course of the interview and the transcript derived therefrom will be given the same treatment and protections afforded statements made before a grand jury pursuant to a court order compelling testimony and granting immunity. Therefore, you have our commitment that none of the information which you provide this Office pursuant to this agreement nor any information directly or indirectly derived therefrom will be used against you in this or any subsequent proceeding with the above-mentioned exception relating to the giving of false or misleading information.

J. ALBERT KROEMER
Attorney
Antitrust Division

ACKNOWLEDGED: _____